THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| **CSAA FIRE & CASUALTY INSURANCE COMPANY,**<br><br>                    **Plaintiff,**<br><br>**vs.**<br><br>**TODD CORBETT, an individual; CHERYL CORBETT, an individual; ANTHONY ORTIZ, an individual; REBEKAH MAUSETH, an individual,**<br>                    **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:24CV00400 DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on cross-motions for summary judgment filed by Plaintiff CSAA Fire and Casualty Insurance Company ("CSAA") and Defendant Rebekah Mauseth ("Ms. Mauseth"). The court held oral argument on the motions on November 6, 2025. At the hearing, Defendant was represented by Amberly Page and Mark L. Anderson, and Ms. Mauseth was represented by Rebecca L. Hill and William J. Hansen. At the conclusion of the hearing, the court took the matter under advisement. Now being fully informed, the court issues the following Memorandum Decision and Order granting Defendant's motion.

## INTRODUCTION

This case centers on whether a $2 million Personal Umbrella Policy ("the Umbrella Policy") issued by CSAA provides excess liability coverage for Ms. Mauseth, the victim of an automobile-pedestrian accident. Mr. Anthony Ortiz ("Mr. Ortiz"), is the son-in-law of the CSAA

1

policy holders, Todd and Cheryl Corbett (the "Corbetts"), and he was the driver of the car that struck Ms. Mauseth as she was crossing a street. The Corbetts also had a Personal Auto Policy ("Auto Policy") issued by CSAA.

There are no issues of disputed fact, and both sides seek declaratory judgment that the CSAA Umbrella Policy should be interpreted in their respective favors. CSAA maintains that the Corbetts' Umbrella Policy is clear that liability coverage is not available to Mr. Ortiz because he is not an "insured" under that policy, even though he falls within the definition of "insured" under the Corbetts Auto Policy. On the other hand, Ms. Mauseth argues that the Umbrella Policy is ambiguous and is reasonably susceptible to multiple interpretations, including that it provides coverage to Mr. Ortiz in this situation. Therefore, she contends, the policy should be interpreted in favor of coverage.

**BACKGROUND**

At the time of the accident, Ms. Mauseth was an undergraduate student at Brigham Young University in Provo, Utah. On September 17, 2022, she was walking home and had almost made it across the intersection of 700 North and 1100 East in Provo.  Mr. Ortiz was driving a 2007 Hyundai Accent owned by his in-laws, the Corbetts, with their permission. His wife, Melinda Corbett Ortiz, was asleep in the passenger seat. By Mr. Ortiz's own admission, he was driving over the speed limit when he drifted off or became distracted and veered into the bike lane, slamming into Ms. Mauseth ("the Accident"). Ms. Mauseth suffered permanent, life-altering injuries as a result of the Accident and Mr. Ortiz's negligence.

The Hyundai Accent is specifically listed on the Declarations in the Auto Policy and in the Umbrella Policy. For liability coverage, the Auto Policy defines "insured" to include "[a]ny person while using "your covered auto" with your express or implied permission and within the scope of that permission." The Auto Policy has liability limits in the amount of $250,000. There is no dispute that Mr. Ortiz is an "insured" under the Auto Policy.

The Umbrella Policy, however, has a different definition of "insured," which is defined as the named insured, the named insured's spouse, and resident family members. There is no dispute that Mr. and Mrs. Ortiz were not "resident family members." Unlike the definition of "insured" in the Auto Policy, the Umbrella Policy definition does not include any person while using a listed auto with the named insured's express or implied permission.

Ms. Mauseth made a claim to CSAA based on the liability of Mr. Ortiz in negligently operating the Hyundai Accent and causing her injury, making a demand for the policy limits of both the Auto Policy and the Umbrella Policy, as her injuries and damages are well in excess of both policies' limits. CSAA acknowledged that coverage was owed under the Auto Policy and offered the $250,000 limit of the Auto Policy to Ms. Mauseth.

CSAA, however, declined the demand for the $2,000,000 Umbrella Policy limit, denying that coverage was owed under the Umbrella Policy. CSAA asserts that the Umbrella Policy does not provide coverage to Mr. Ortiz because he does not qualify as an "insured" under the Umbrella Policy.

Ms. Mauseth, however, argues that because the language of the Insuring Agreement provides for separate types of coverage when the underlying insurance is—or is not—issued by CSAA, and when the underlying insurance and the Umbrella Policy are both issued by CSAA, the term "insured" as used in the Umbrella Policy is reasonably interpreted to refer to the definition of insured as used in the underlying Auto Policy "as a broader measure of protection," rendering Mr. Ortiz an insured. Moreover, not only is the language of the Insuring Agreement ambiguous, but reading the Umbrella Policy's language as a whole also creates ambiguity. Mr. Ortiz's use of the Corbetts' auto falls within the Umbrella Policy's definition of "auto liability" and is an exception to the Umbrella Policy's "Auto Liability" exclusion, thereby providing coverage.

Because the court finds as a matter of law that the Umbrella Policy is ambiguous, under Utah law, the court must construe the language in favor of coverage and against CSAA as the drafter of the insurance policy.

## DISCUSSION

### I. RELEVANT PROVISIONS OF THE CORBETTS' UMBRELLA POLICY

The language of the Insuring Agreement is the primary provision at issue in this lawsuit. The Insuring Agreement provides as follows:

III. COVERAGES[1]

**A. Insuring Agreement**[2]

---

[1] In the provisions of the Umbrella Policy, the terms in quotation marks are defined terms in the Umbrella Policy.

4

1. We will pay "damages" in excess of the "retained limit" that any "insured" is legally liable to pay for "bodily injury", "personal injury" or "property damage" due to an "occurrence" to which this insurance applies. [This paragraph is referred to below as "Part 1" of the Insuring Agreement].

2. This insurance applies:

   a. As excess insurance over and above the greater of:

      (1) The minimum limits of liability required to be maintained as stated in the Declarations; or

      (2) The actual liability limits provided by the "underlying insurance" if such actual limit is greater than the minimum limits of liability stated in the Declarations.

   b. Except for the definition of "insured", this insurance applies as excess following form liability coverage over the "underlying insurance" policies issued by insurers other than subsidiary companies or strategic partners of us. Following form means that we will use the definitions, coverages, exclusions, conditions and other provisions of such "underlying insurance" policies and will cover damages only to the extent that coverage is afforded to any "insured" under those policies. Regardless of any other term or condition in this policy, this policy shall not be interpreted to provide any broader coverage than afforded by such "underlying insurance".

   c. As a broader measure of protection over the "underlying insurance" policies issued by us, or subsidiary companies or strategic partners of us.

Together, these separate coverages share the same limits of liability and cannot be stacked.

The following definitions are provided in the Umbrella Policy. "Insured" means: You or a

"family member."[3] A "family member" is a "resident of your household who is: a. Related to

---

[2] *See* ECF No. 43-2 at 16. Page numbers refer to the page numbers generated by CM/ECF.

[3] *Id.* at 13 [CSAA 00098].

you by blood, marriage, 'domestic partnership', 'civil union' or adoption . . . ." There is no dispute that this narrow definition of "insured" excludes Mr. Ortiz because he is not a resident of the Corbetts' household.

The Umbrella Policy defines "damages" as "sums for which any 'insured' is legally liable as compensation for 'bodily injury,' 'personal injury' or 'property damage' caused by an 'occurrence' to which this insurance applies." An "occurrence" under the Umbrella Policy is "[a]n accident . . . which results, during the policy period, in 'bodily injury' or 'property damage.'" The Umbrella Policy defines "retained limit" to include "[t]he total limits of any 'underlying insurance' and any other insurance that applies to an 'occurrence,' which: (1) [a]re available to any 'insured.'"  It defines "Underlying Insurance" to mean "any policy providing the 'insured' with primary liability insurance covering one or more of the types of liability listed in the Declarations and at limits no less than the retained policy limits shown for those types of liability listed in the Declarations."

The Umbrella Policy defines "Auto Liability" [4] as:

a.     Liability for "bodily injury" or "property damage" arising out of the:

    (1)     Ownership of such vehicle or craft by any "insured";

    (2)     Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

    (3)     Entrustment of such vehicle or craft by any "insured" to any person;

---

[4] *Id.* at 9 [CSAA 00094].

(4)　　Failure to supervise or negligent supervision of any person involving such vehicle or craft by any "insured"; or

(5)　　Vicarious liability, whether or not imposed by law, for the actions of any person involving such vehicle or craft.

The Umbrella Policy also contains a number of exclusions to coverage, with one that

specifically addresses "Auto Liability":

A. The coverages provided by this policy do not apply to:

* * * *

9.　　"Auto Liability"[5]

However, this Exclusion . . . does not apply to an "auto" to the extent that "auto" liability coverage is provided by "underlying insurance" at the time of the "occurrence", and does not apply to an "auto" not subject to motor vehicle registration which is:

a.　Used to service an "insured's" residence;

b.　Designed for assisting the handicapped; or

c.　In dead storage on an insured location.

An "auto" for Auto Liability purposes includes "[a] private passenger motor vehicle."[6]

## II.  UTAH LAW ON CONTRACT INTERPRETATION

Under Utah law, "[i]nsurance policies are contracts between the insurer and the insured

and must be analyzed according to principles of contract interpretation."[7] "Courts determine

---

[5] *Id.* at 23 [CSAA 00108].

[6] *Id.* at 10. [CSAA 00095].

[7] *Compton v. Houston Cas. Co.*, 393 P.3d 305, 310 (Utah 2017).

the legal import of insurance policies, affording the policy terms their usually accepted meanings and giving effect to and harmonizing to the extent possible all policy provisions."[8] The first step in a court's analysis is to "look at the contract and construe its terms to give effect to the intention of the parties" and "the best indication of the parties' intent is the language they chose to use in the contract . . . [and] gleaned from an examination of the text of the contract itself."[9]

Under Utah law, if the language of the insurance contract is unambiguous, "the court must construe it according to its plain and ordinary meaning."[10] If, however, the insurance contract contains "ambiguous or uncertain language . . . that is fairly susceptible to different interpretations," then the contract should be construed in favor of coverage.[11] Utah courts have established this rule of insurance contract interpretation "in order to assure that the purpose for which the policy was purchased and the premiums were paid is not defeated" and because insurance contracts "are generally drafted by the insurance companies and allow no opportunity for negotiation of the terms by the insured."[12]

---

[8] *S.W. Energy Corp. v. Continental Ins. Co.*, 974 P.2d 1239, 1242 (Utah 1999).

[9] *Id.*

[10] *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 836 (Utah 1998).

[11] *Farmers Ins. Exch. v. Versaw*, 99 P.3d 796, 800 (Utah 2004); *S.W. Energy Corp.*, 974 P.2d at 1242.

[12] *Mellor v. Wasatch Crest Mut. Ins. Co.*, 201 P.3d 1004, 1009 (Utah 2009).

To avoid ambiguity, "an insurance contract must communicate its terms with sufficient clarity that it can be understood by a reasonable purchaser of insurance."[13] The test of clarity in an insurance contract is as follows: "would the meaning be plain to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy?"[14]

An insurance policy may be ambiguous if it is unclear, omits terms, or is capable of two or more plausible meanings.[15] Utah courts have found that typically ambiguities appear in two forms: 1) ambiguities arise "because of vague or ambiguous language in a particular provision," or 2) ambiguities arise "because two or more contract provisions, when read together, give rise to different or inconsistent meanings, even though each provision is clear when read alone."[16]

### III.  DOES THE UMBRELLA POLICY PROVIDE COVERAGE TO MR. ORTIZ?

CSAA asserts that the Umbrella Policy unambiguously does not afford coverage to Mr. Ortiz because he does not qualify as an "insured" as that term is used in Part 1 of the Umbrella Policy Insuring Agreement. Coverage exists when an insured is legally liable to pay bodily injury, property damage, or personal injury damages arising from an occurrence to which the liability

---

[13] *Id.* at 1008.

[14] *Id.*; *see also First Am. Title Ins. Co. v. J.B. Ranch*, 966 P.2d 834, 836 (Utah 1998) ("A policy is ambiguous only if it is not plain to a person of ordinary intelligence and understanding.).

[15] *S.W. Energy Corp.* 974 P.2d at 1242; *see also J.B. Ranch*, 966 P.2d at 837 (Utah 1998) (the interpretation proposed "must be plausible and reasonable in light of the language used.").

[16] *Mellor*, 201 P.3d at 1008 (internal quotations and citations omitted).

insurance applies, and which is in excess of the retained limit. Here, according to CSAA, no "insured" is legally liable to pay for any damages arising from the accident because the only "insureds," as that term is defined in the Umbrella Policy, are Todd and Cheryl Corbett. Mr. Ortiz is the only liable party, and he is not an "insured" as that term is defined in the Umbrella Policy. CSAA maintains that the policy language is clear and unambiguous.

Whether an insurance policy is ambiguous is a question of law,[17] and the court agrees with Ms. Mauseth that the Umbrella policy is ambiguous because it is unclear and is capable of two or more plausible meanings. There are different and inconsistent meanings that arise when the provisions of the Insuring Agreement are read together as a whole; and there is additional ambiguity introduced when considering the exception to the Auto Liability exclusion. Accordingly, there are two plausible and reasonable interpretations of the Umbrella Policy relating to whether excess coverage is afforded to Mr. Ortiz when he was driving the Hyundai Accent with the permission of the Corbetts at the time of the Accident, and, under Utah law, the court must resolve this ambiguity in favor of coverage.

1. When Read as a Whole, the Provisions of the Insuring Agreement Create Ambiguity as to Whether Mr. Ortiz Is an Insured Under the Umbrella Policy

The Umbrella Policy's Insuring Agreement provisions, when read as a whole, and the use of the quoted term "insured," yield two different and inconsistent interpretations regarding the

---

[17] *S.W. Energy Corp.*, 974 P.2d at 1242; *Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 432 (Utah 2006) ("Whether an ambiguity exists in an insurance contract is a question of law.).

scope of excess coverage provided when the underlying insurance is issued by CSAA or its subsidiaries.

As set forth above, the Insuring Agreement states:

1.  We will pay "damages" in excess of the "retained limit" that any "insured" is legally liable to pay for "bodily injury", "personal injury" or "property damage" due to an "occurrence" to which this insurance applies.

But ambiguity is created when juxtaposing subparts b and c of Part 2 of the Insuring Agreement:

2. This insurance applies:

\*     \*     \*     \*

| b.    **Except for the definition of "insured"**, this insurance applies as excess following form liability coverage over the "underlying insurance" policies issued by insurers other than subsidiary companies or strategic partners of us. Following form means that we will use the definitions, coverages, exclusions, conditions and other provisions of such "underlying insurance" policies and will cover damages only to the extent that coverage is afforded to any "insured" under those policies. Regardless of any other term or condition in this policy, this policy shall not be interpreted to provide any broader coverage than afforded by such "underlying insurance". | c.  As a broader measure of protection over the "underlying insurance" policies issued by us, or subsidiary companies or strategic partners of us. |
| --- | --- |

On one hand, when the underlying insurance is *not* issued by one of CSAA's subsidiary companies or strategic partners, Subpart 2b expressly limits excess coverage to the "insured," as defined in the Umbrella Policy—not how that term is defined in the underlying insurance. But on the other hand, when the underlying insurance *is* issued by CSAA or one of its subsidiary companies or strategic partners, as was the case here, Subpart 2.c. states that coverage applies "as a broader measure of protection over the 'underlying insurance' policies issued by us."

Subpart 2c does not contain the same language found in Subpart 2b, limiting coverage to the definition of "insured" under the Umbrella Policy, meaning that the broader measure of protection encompasses how "insured" is defined under the underlying insurance issued by CSAA or its subsidiary companies or strategic partners, which, in this case is the Corbetts' Auto Policy. Under the Auto Policy, Mr. Ortiz undisputedly qualifies as an "insured."

CSAA is undoubtedly aware that its underlying Auto Policy defined "insured" to include permissive users, like Mr. Ortiz. And the Umbrella Policy states that it applies "[a]s a broader measure of protection over" the Auto Policy. The Umbrella Policy's Part 2c is reasonably interpreted to mean that it broadens the definition of "insured," and the phrase "any 'insured'" used in Part 1 of the Umbrella Policy's Insuring Agreement means "insured" as that term is defined in the Auto Policy when the underlying insurance is issued by CSAA, affording excess coverage to Mr. Ortiz for the Accident. This interpretation of the Insuring Agreement accounts for all the provisions as they relate to the facts of this case and is reasonable and plausible because it gives effect to and harmonizes to the extent possible all of its provisions.

Moreover, if CSAA had intended to limit excess coverage to only those persons qualifying as "insureds" as defined in the Umbrella Policy when the underlying insurance is issued by CSAA, it could have included within Subpart 2c the same prefatory language of "Except for the definition of 'insured'" that it used in Subpart 2b. CSAA, however, did not use the same prefatory language in Subpart 2c, arguably because it intended to provide different coverage depending upon the underlying insurance and provide broader coverage (not

12

narrower coverage) when premiums are paid for both underlying insurance and excess insurance, which is the case here with the Auto Policy and Umbrella Policy.

Additionally, had CSAA intended to limit excess coverage to only those persons qualifying as "insureds" as defined in the Umbrella Policy and *not* for insureds as defined more broadly in its underlying Auto Policy, then CSAA should have explained and warned of that fact in the Declarations in its section entitled "Important Notices," which provides as follows:

---

**Important Notices**

**Personal Injury Coverage Notice**
All Residential and Rental Premises policies must have "personal injury" coverage, as defined in the Definitions section of your Personal Liability Umbrella Endorsement.

**Notice Regarding Uninsured/Underinsured Motorists Coverage**
We do not provide Uninsured or Underinsured Motorists Coverage or any similar coverage.

**Notice Regarding Exclusion of Vicious Dogs and Dogs with Prior Bite History**
We do not cover dogs with any type of prior bite history or certain breeds of dogs: Akita; Chow; Doberman Pinscher; Pit Bull or Pit Bull mix; Presa Canario; Rottweiler; or Wolf, Wolf Hybrid or Wolf Dog. Please review your policy for information regarding this exclusion.

Please review your policy for information regarding additional exclusions.

---

2. The Umbrella Policy's Use of the Phrase "Broader Measure of Protection" in Part 2c of the Insuring Agreement is Unclear and Vague

The court also finds that the Umbrella Policy's use of the phrase "broader measure of protection" in Part 2c of the Insuring Agreement is unclear. The phrase "broader measure of protection" does not communicate with sufficient clarity whether broader protection means additional limits over and above the underlying insurance, or a broadened scope of coverage— or both. The phrase could mean that the Umbrella Policy provides additional limits of insurance compared to those covered by the underlying insurance issued by CSAA. Alternatively, the

13

phrase could mean providing coverage for additional or different types of risks than the underlying insurance covers. There is no additional language or provisions in the Umbrella Policy to elucidate how the Umbrella Policy provides a broader measure of protection over the underlying insurance issued by CSAA. The meaning of "broader measure of protection" is not plain to a reasonable purchaser of insurance, particularly within the context of this case, where Mr. Ortiz is an insured under the Auto Policy, and the Umbrella Policy expressly provides that it applies "as a broader measure of protection" over the Auto Policy. If CSAA intended to reduce the scope of coverage under the Umbrella Policy, it could have explained the reduction in scope rather than using the phrase "broader measure of protection."

In reading the Insuring Agreement as a whole, "a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, and in light of existing circumstances, including the purpose of the policy,"[18] would conclude that the Umbrella Policy would provide coverage to Mr. Ortiz in this situation. At the very least, the Insuring Agreement is ambiguous and must be construed in favor of coverage.

3. Other Provisions of the Umbrella Policy Support Interpreting the Policy as Providing Excess Coverage to Mr. Ortiz

Not only is the Insuring Agreement ambiguous, but further ambiguity is introduced by examining other provisions of the Umbrella Policy. CSAA's interpretation of the Umbrella Policy is contrary to the Umbrella Policy language defining "Auto Liability" and the Umbrella Policy auto liability exclusion.  The definition of Auto Liability provides:

---

[18] *Doctors' Co. v. Drezga*, 218 P.3d 598, 603 (Utah 2009).

14

1.      . . . "Auto Liability" subject to the provisions in 1.b. below, mean(s) the following:

    a.      Liability for "bodily injury" or "property damage" arising out of the:

        (1)      Ownership of such vehicle or craft by any "insured";

        (2)      Maintenance occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

        (3)      Entrustment of such vehicle or craft by any "insured" **to any person**;

        (4)      Failure to supervise or negligent supervision of any person involving such vehicle or craft of any insured; or

        (5)      Vicarious liability

    b.      For the purpose of this definition:

    * * * *

        (5)      "Auto" means an "auto" as defined in 2. Below

            2. "Auto" means:

                a.   A private passenger motor vehicle, motorcycle, moped or motor home . . .

Thus, the definition of "Auto Liability" specifically includes liability for "bodily injury" arising out of the "operation [or] use" of an auto "**by any person.**"  Mr. Ortiz's operation and use of the Hyundai Accent is operation and use "by any person," which falls within the definition of "Auto Liability" under the Umbrella Policy.

15

The "Auto Liability" exclusion and certain other vehicular liability exclusions provide *exceptions* to the exclusions for liability to the extent it is covered by the underlying insurance. The Umbrella Policy's exclusion section provides, in relevant part:

### IV. EXCLUSIONS

A. The coverages provided by this policy do not apply to:

* * * *

9.      "Auto Liability"

> However, this Exclusion A.9. does not apply to an "auto" to the extent that "auto" liability coverage is provided by "underlying insurance" at the time of the "occurrence"
> . . . .

Thus, the "Auto Liability" exclusion expressly states that it does not apply to, and therefore the Umbrella Policy provides coverage for, an auto "to the extent that 'auto' liability coverage is provided by 'underlying insurance' at the time of the 'occurrence.'"  Accordingly, the Umbrella Policy's definition of "Auto Liability" and its "Auto Liability Exclusion" further demonstrate that CSAA's interpretation of the Umbrella Policy is flawed. The Umbrella Policy's language is susceptible to a different and reasonable interpretation, providing coverage to Mr. Ortiz for his use of the Hyundai Accent at the time of the Accident.

The Umbrella Policy is ambiguous and susceptible to at least two reasonable and plausible interpretations, and the court therefore construes the Umbrella Policy in favor of coverage. The court finds as a matter of law that CSAA owes excess liability coverage for the Accident that injured Ms. Mauseth.

16

**CONCLUSION**

Accordingly, for the foregoing reasons, CSAA's Motion for Summary Judgment [ECF No. 43] is DENIED and Ms. Mauseth's Motion for Summary Judgment and Declaratory Judgment [ECF No. 44] is GRANTED.  The Clerk of Court is directed to close this case. [19] A separate judgment will be entered.

DATED this 30th day of March 2026.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

---

[19] During this litigation, neither the Corbetts nor Mr. Ortiz filed an Answer, and the court entered certificates of default against them. *See* ECF No. 32-34. CSAA agreed, however, that the court's decision on the motions would resolve CSAA's questions concerning its coverage obligations, and it therefore did not intend to pursue default judgments against the Corbetts or Ms. Ortiz. *See* ECF No. 40.